# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### 1:11-cv-114-RJC

| | | |
|---|---|---|
| TIMOTHY ANSEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| CLARENCE HICKS, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**THIS MATTER** comes before the Court on Plaintiff's Motion for Partial Summary Judgment, (Doc. No. 22), on Defendants' Motion for Summary Judgment, (Doc. No. 24), and on Plaintiff's Notice of Objection and Motion to Reverse Decision re Order on Motion to Strike and Motion to Compel, (Doc. No. 32).[1]

## I.     BACKGROUND

### A.     Procedural Background

On May 12, 2011, Plaintiff, an inmate in the custody of the North Carolina Department of Public Safety, formerly known as the Department of Correction (and hereinafter referred to as the "DOC"),[2] filed this pro se action, pursuant to 42 U.S.C. § 1983, against the following employees of Mountain View Correctional Institution ("Mountain View") in Spruce Pine, North Carolina:  Clarence Hicks, Food Service Officer; Randy Ledford, Food Service Manager; Robert

---

[1]  In accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), Plaintiff was advised of the necessity of filing responses to Defendants' summary judgment motion and of the manner in which evidence could be submitted to the Court.  (Doc. No. 28).

[2]  As of January 1, 2012, the North Carolina Department of Correction was consolidated into the North Carolina Department of Public Safety as the Division of Adult Correction.  See N.C. GEN. STAT. § 143B-600 (2011).

Winebarger, Food Service Officer; R. David Mitchell, former Administrator; Edward Osteen, Disciplinary Officer; John Mark Freeman, Assistant Unit Manager; and Brandon Hodges, Correctional Officer.

Plaintiff alleges that Defendants charged him with disciplinary infractions in retaliation for his exercise of his First Amendment rights and that Defendants violated his due process rights. On November 30, 2011, Plaintiff filed a Motion for Partial Summary Judgment, seeking summary judgment as to the retaliation claim. (Doc. No. 22). Plaintiff seeks reinstatement of his name for transfer, reassignment to a single cell, and that each Defendant be "sanctioned" in accordance with DOC policy. Plaintiff is also seeking compensatory damages for loss of pay jointly against each Defendant, reimbursement of $10.00 jointly against each Defendant, punitive damages of $2,000.00 against each Defendant, and nominal damages as the court deems appropriate.

On December 22, 2011, Defendants filed their own motion for summary judgment. (Doc. No. 24). Defendants contend that Plaintiff has failed to raise a genuine issue of material fact as to his retaliation and due process claim. Defendants contend, alternatively, that sovereign and qualified immunities shield them from Plaintiff's claims for monetary damages.[3]

B.    Factual Background

1.    The Parties' Summary Judgment Materials

Defendants' summary judgment materials include the pleadings and all attachments and

_____

[3] Plaintiff sued Defendants in their individual and official capacities. To the extent that Plaintiff alleges claims against the individual defendants in their official capacities, he may not recover money damages from them. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 70-71 (1989) (holding that, in an action for money damages, state officials and employees acting in their official capacities are not "persons" as contemplated by § 1983).

the affidavits of Defendants Mitchell with Exhibit A; Winebarger with Exhibit A; Osteen with Exhibits A-E; and Reggie Weisner (not a party) with Exhibit A. See (Doc. Nos. 25-2; 25-3; 25-4; 25-5). Plaintiff's summary judgment materials include the allegations in his Complaint, Plaintiff's Declaration, and Plaintiff's brief in response to Defendants' motion for summary judgment. (Doc. Nos. 1; 29-1; 29-2). The Court has examined the evidence in the light most favorable to Plaintiff in determining whether there are any genuine issues of material fact in this case.

2.   Facts Related to Plaintiff's Three Disciplinary Infractions and Resulting Hearings on the Infractions

i.   January 19, 2011, Disciplinary Infraction for Not Abiding by Kitchen Rules

Plaintiff, an inmate incarcerated at Mountain View, was assigned a job in the facility's kitchen. On January 19, 2011, Plaintiff was observed on video eating in the kitchen by the cook area where eating is prohibited. (Doc. No. 25-4 at 1: Winebarger Affidavit; Doc. No. 25-3 at 12: Exhibit to Osteen Affidavit). Plaintiff was charged with a disciplinary infraction for not abiding by kitchen rules. (Doc. No. 25-3 at 5: Exhibit A to Osteen Affidavit). Plaintiff does not deny that there is a videotape showing that he was eating in the kitchen by the cook area, but he contends that he was being singled out for the infraction because the staff and inmates all eat in that area. See (id. at 9; 13).

Plaintiff alleges that during the week of January 24, 2011, Food Service staff at Mountain View began conducting strip searches on inmate kitchen workers. (Doc. No. 1 at 3: Complaint). According to Plaintiff, Defendant Winebarger told Plaintiff and other inmates that the strip searches would continue until "someone put it on paper" the name of the inmate who had stolen food from the kitchen. (Id. at 3). Plaintiff alleges that he complained to Defendants Hicks and

Winebarger that the way that they were conducting the searches was unconstitutional, and Defendant Winebarger responded that "they were guards and there was nothing that the inmates could do about it." (Id. at 4).  According to Plaintiff, he was also told that if the inmates filed grievances, the strip searches would continue and that the searches were being conducted because food was being stolen.  (Id.).

In addition to complaining about the strip searches, Plaintiff questioned the use of V8 juice by Food Service staff for certain diets.  (Id.).  Defendant Winebarger and Officer Kidd told Plaintiff that the juice belonged to staff.  Plaintiff told Defendant Winebarger and Officer Kidd that "they were doing the same thing that the inmates were accused of doing."  (Id. at 6).  According to Plaintiff, Defendant Winebarger told Plaintiff that he (Winebarger) was doing what "Defendant Ledford instructed him to do."  (Id.).

      ii.    February 3, 2011, Disciplinary Infraction for Failing to Rotate Stock in A Cooler As Instructed

On February 3, 2011, Defendant Hicks charged Plaintiff with a disciplinary infraction for failing to rotate the stock in cooler # 2 as instructed.  (Doc. No. 25-3 at 2, ¶ 5; 14: Osteen Affidavit & Exhibit A).  Plaintiff alleges that Defendant Hicks falsely accused Plaintiff of disobeying the order to rotate the stock and that Defendant Hicks had supervised and approved its rotation.  Plaintiff further alleges that Defendant Hicks told Plaintiff that "inmate complainers and the lawyer who writes their grievances for them need to be quiet."  (Doc. No. 1 at 6).  Plaintiff contends that Defendant Hicks also told Plaintiff that "inmates cannot win because nobody would believe an inmate over an officer and that it would be easy to turn every inmate against Plaintiff."  (Id.).

Plaintiff told the investigating officer that he was given the infraction because he has

complained to staff about inmate strip searches and embezzlement of items by kitchen staff. (Doc. No. 25-3 at 16: Osteen Affidavit & Exhibit A). On February 4, 2011, Plaintiff was given his Inmate Rights sheet for the infraction. Also on February 4, Mountain View officials instructed Food Service staff to conduct complete strip searches of only those inmates suspected of stealing food.[4] (Doc. No. 25-2 at 1, ¶ 4: Mitchell Affidavit). The searches were conducted to the side of the wall away from cameras, and none of the inmates requested to be searched privately. (Id.).

        iii.    February 6, 2011, Infraction for Reporting to Work when Plaintiff Was Not Scheduled to Work

On February 6, 2011, Defendant Winebarger charged Plaintiff with a disciplinary infraction for being in an unauthorized area as a result of reporting to work when he was not scheduled to work.[5] (Doc. No. 25-3 at 33; 41; 42: Exhibit E to Osteen Affidavit). Investigating officer Hodges noted in his report that Officer Winebarger stated that Plaintiff came to work on February 6 although he was not on the wake-up list to report to work that day.[6] (Id. at 36; 38; 41; 42). Defendant Winebarger states that he never gave permission to Plaintiff to come in to work on February 6. (Id. at 36; 44).

According to Plaintiff, he did not commit an infraction. Plaintiff alleges that on February 5, 2011, when Plaintiff asked Winebarger if he could work the next day, Winebarger told

---

[4] Respondent asserts that DOC policy does not prohibit strip searches.

[5] DOC Policy and Procedure, Chapter B, Section .0202(d)(D1) prohibits inmates from being in an unauthorized area. (Doc. No. 25-4 at 1, ¶ 4; 4: Winebarger Affidavit & Exhibit A).

[6] Inmates who are scheduled to work on a particularly day are listed on a "wake-up list" for that day. (Doc. No. 25-4 at 1-2: Winebarger Affidavit).

Plaintiff that "he [Winebarger] had submitted the wake up sheet but to come anyway." (Doc. No. 1 at 7; Doc. No. 25-2 at 20: Exhibit A to Mitchell Affidavit). When Plaintiff reported to work the next day, Defendant Winebarger told him to return to his block and that he was no longer allowed to work. (Doc. No. 25-4 at 2, ¶ 5; Winebarger Affidavit).

Plaintiff alleges that on February 7, 2011, he wrote to Assistant Superintendent Lawler and Captain Moody of Internal Affairs about the infraction charges. (Doc. No. 1 at 10). Plaintiff further informed Lawler and Moody that he had witnessed Food Service staff embezzling items from the kitchen and that Food Service staff had requested that Plaintiff be transferred to another institution. (Id.). Plaintiff also wrote DOC's Director of Support Services and the Director of Administrative Services. In an undated letter, Plaintiff claimed that he had witnessed Food Service staff misapply "tens of thousands of dollars of DOC property." (Doc. No. 25-2 at 15; 18: Exhibit A to Mitchell Affidavit). Plaintiff also asserted that he was a "target for retaliation" since bringing the misappropriation of food to the Food Service staff's attention. (Id.). Plaintiff wrote that Food Service workers were embezzling V8 juice, peanut butter, meat, tuna fish, and juice drinks. (Id. at 15-16; 18-19). Plaintiff had previously complained to Lawler and Moody about his fear of retaliation from the kitchen staff because Plaintiff had reported the embezzlement and the strip searches and an investigation was in progress. (Doc. No. 1 at 10: Complaint).

    iv.    February 9, 2011, Hearing on the January 19 and  February 3
               Disciplinary Infractions

On February 9, 2011, Defendant Osteen conducted a hearing on both the January 19 and February 3 charges. (Doc. No. 25-3 at 2, ¶ 5: Osteen Affidavit). Plaintiff pled not guilty to both charges. (Id.). As to the January 19 offense, Correctional Officer Silvers was assigned to assist

Plaintiff, but Plaintiff declined to speak with the officer before the hearing. (Id. at 7). Plaintiff insisted that he was being "singled out" for the offense and that all of the inmate kitchen staff eat in the prohibited area. Plaintiff also said that he was being "written up" because he told staff that V8 juice was disappearing from the stock. Based on the evidence, Defendant Osteen found Plaintiff guilty of the January 19 offense. (Doc. No. 25-3 at 2, ¶ 5).

As to the February 3 offense of failing to rotate the stock in the cooler, Defendant Hicks was the officer who had accused Plaintiff of failing to rotate the stock as ordered. See (id. at 16; 20; 22). Defendant Hodges was the investigating officer.

Defendant Hodges indicated in his report that he re-interviewed Defendant Hicks after taking Plaintiff's statement. Defendant Hicks showed Defendant Hodges how Plaintiff had taped the new stock in the front of the cooler and left the old stock in the back. (Id. at 16). Plaintiff requested staff assistance at the hearing, and Officer Silvers was assigned, but Plaintiff refused to meet with Officer Silvers before the hearing. (Id. at 16; 18). Plaintiff pled not guilty at the second hearing. (Id. at 16). Plaintiff argued that he was being retaliated against because he reported to Food Service staff that V8 juice was missing at an "alarming rate." (Id.). He also insisted that Defendant Hicks gave him permission to tape off the eggs and to mark them. (Id.). Plaintiff also told Defendant Hodges that the infraction charge was in retaliation for him accusing kitchen staff of embezzling state property and that, although six people were responsible for rotating stock, only the two inmates who complained were given an infraction. Before the hearing, Plaintiff requested that the empty boxes which contained the stock be presented at the hearing to show they were properly dated, and he also requested Defendant Hodges to look at the stock to see if it was appropriately stacked. Both requests were denied.

Based on the evidence presented at the hearing, Defendant Osteen found Plaintiff guilty of the January 19 and February 3 offenses. (Id. at 2, ¶ 5; 16). After Defendant Osteen found Plaintiff guilty of both the charges, Plaintiff told Osteen that he had not waived his right to 24-hour notice of the hearings on the charges. Defendant Osteen reviewed the paperwork and confirmed that Plaintiff had not waived his right to the 24-hour notice. Defendant Osteen encouraged Plaintiff to appeal his decisions, explaining that they would probably be dismissed. Defendant Osteen meticulously explained to Plaintiff the appeal process, showed Plaintiff where to send his appeal, and put brackets around the address for emphasis. Defendant Osteen also told Plaintiff that his appeal had to be in Raleigh within fifteen days, and he emphasized the date and underlined it. He reminded Plaintiff that he did not have to place a stamp on the envelope and underlined that portion of the instructions as well. (Id. at ¶ 6 & Exhibit B).

Plaintiff appealed Defendant Osteen's ruling as to both the January 19 and February 3 infractions, arguing that he was denied this right to 24-hour notice; that he was denied the right to have evidence gathered and to present it at the hearings to show that the staff was singling him out and using the disciplinary process unfairly; and that Hicks' statement regarding Plaintiff's failure to rotate the stock in the cooler was false. (Doc. No. 25-3 at 26; 27).

v.     February 15, 2011, Hearing on the February 6 Disciplinary Infraction

On February 15, 2011, Defendant Osteen held a disciplinary hearing for the February 6, 2011, disciplinary infraction for reporting to work when he was not scheduled to work. (Doc. No. 25-3 at 3, ¶ 8: Osteen Affidavit). Plaintiff alleges that when the investigating officer Defendant Hodges told Plaintiff on February 11 that he was being charged with the disciplinary infraction of being in an unauthorized area, Plaintiff requested the incentive wage sheets, work

8

schedules, and wake sheets for the third shift kitchen for the last six months to show that, although he was not scheduled to work on Sundays, he worked most Sundays and was paid. (Doc. No. 1 at 11). According to Plaintiff, he also tried to show the investigating officer the trust fund sheets showing that he worked 7 days a week 25 weeks out of 28, but Defendant Hodges refused to look at any of Plaintiff's evidence. (Id.).

Plaintiff asked Captain Moody and Defendant Osteen to be witnesses for him at the February hearing, but they denied his request. See (Doc. No. 25-3 at 3, ¶ 8: Osteen Affidavit). Defendant Osteen asserts that he was not present when the infraction occurred, and he had no knowledge about the incident. (Id.). After checking with his supervisor to ensure that there was not a conflict of interest with him as the hearing officer, Defendant Osteen conducted the hearing. (Id.).

Defendant Osteen offered Plaintiff a plea, and Plaintiff initially rejected it. The parties disagree about what happened next. Plaintiff alleges that Defendant Osteen told Plaintiff that he would not look at any evidence until Plaintiff pled, and Osteen instructed Officer Wiseman to take Plaintiff to a holding cell so that Plaintiff could "think about it." (Doc. No. 1 at 12-13). Plaintiff alleges that after 30 to 45 minutes, Officer Wiseman took Plaintiff back to Osteen's office, where Osteen asked Plaintiff if "he was going to plead guilty." (Id. at 13). Plaintiff alleges that Officer Wiseman moved towards Plaintiff with a clenched fist while Osteen told Plaintiff that "it's a shame you won't plead guilty." (Id.). Plaintiff then pled guilty to the charge and was given a suspended punishment. (Doc. No. 25-3 at 3, ¶ 8; 35: Exhibit E to Osteen Affidavit). Plaintiff contends that he was under duress when he pled guilty.

In response to the allegations in the Complaint, Defendants have submitted Osteen's sworn affidavit, in which Osteen states that no one threatened Plaintiff to plead guilty; that

Osteen never told Plaintiff that he would not consider the evidence until Plaintiff pled; and that Wiseman did not stand over Plaintiff with clenched fists. (Id. at ¶¶ 9, 10).

On February 22, 2011, Plaintiff was informed that Defendant Osteen's decision was being upheld. Plaintiff subsequently lost his job as a kitchen worker because of his guilty plea. (Doc. No. 25-4 at 2, ¶ 8: Winebarger Affidavit; Doc. No. 25-2 at 2, ¶ 8: Mitchell Affidavit).

### vi. Mountain View Upholds Infractions and Finds No Due Process Violations

Plaintiff alleges in his Complaint that he filed a state habeas petition on the alleged due process violations on around March 10 or March 21, 2011, and the petition was denied. (Doc. No. 1 at 1). On March 11, 2011, Plaintiff received a letter from Defendant Mitchell. (Id. at 14-15). Defendant Mitchell was responding to Plaintiff's letter to the Director of Prisons. Defendant Mitchell informed Plaintiff that he had reviewed Plaintiff's infractions and found nothing wrong and that there was no evidence of any due process violations. (Id.).

### vii. Plaintiff's Disciplinary Infractions from January 19 and February 3 Are Dismissed

On April 12, 2011, Plaintiff's convictions for the January 19 and February 3 infractions were dismissed. (Doc. No. 25-3 at 30; 31: Exhibit to Osteen Affidavit). Plaintiff was refunded the $10.00 fine for each infraction on the same date. Plaintiff was also restored ten days of gain time credit and he was not required to complete any of the twenty extra duty hours. Plaintiff did, however, have his canteen privileges suspended to allow only essential purchases with a $10.00 spending limit for 30 days. (Id. at ¶ 7 & Exhibits C, D).

Plaintiff alleges that although his earned gain time was reinstated, as a result of Defendants' conduct Plaintiff lost his prison job and the corresponding pay; lost his single cell privilege; was removed from the transfer list; suffered a financial hardship; and lost the ability to

earn gain time credits. (Doc. No. 1 at 8). Plaintiff alleges that Defendants Hicks and

Winebarger violated his First Amendment right to free speech. (Id.). Plaintiff further alleges

that Defendants Hicks and Winebarger retaliated against Plaintiff by falsely charging him with

disciplinary infractions and by "labeling him a 'snitch' to the inmate population," subjecting him

to a constant threat of violence. (Id.).

           3.          Facts Related to the Investigations into Plaintiff's Allegations that
                         Members of the Food Service Staff Were Embezzling and that the
                         Infractions Against Plaintiff Were Made in Retaliation for Plaintiff's
                         Allegations

Two separate investigations were conducted regarding Plaintiff's allegations that

members of the Food Service staff were embezzling by stealing food from the kitchen, and

Plaintiff's allegations that prison employees were retaliating against him by charging him with

bogus disciplinary infractions. Mountain View Correctional Captain Jay Moody conducted one

investigation and submitted it to former Superintendent Mitchell on March 15, 2011. (Doc. No.

25-2 at 2, ¶ 5: Mitchell Affidavit). Special Investigator Reggie Weisner conducted the second

investigation and submitted it to Ricky Anderson, Deputy Director of Prisons, on May 5, 2011.

(Id. at 3, ¶ 9).

Captain Moody spoke with Plaintiff and other inmates who had alleged that Food Service

staff were stealing food from the kitchen. (Id. at 6-7: Exhibit A to Mitchell Affidavit). Captain

Moody also spoke with Samuel Wood, the  Food Service Manager; Defendants Ledford,

Winebarger, and Hicks; Food Service Officers Pamela Kidd and Velvia Carpenter; and members

of the Food Service staff from other shifts. (Id. at 7-11). Staff told Captain Moody that V8 juice

was used in diet salad dressing, explained the way staff used meat and meat leftovers, and said

that chocolate milk was sometimes used as a substitute for two percent white milk. (Id.).

During the investigation, Defendant Winebarger acknowledged that he allowed inmates to work when they were not scheduled, but he stated that he did not recall approving Plaintiff for work on February 6, 2011. (Id. ¶ 6, Exhibit A; Doc. No. 25-2 at 8; Exhibit A to Mitchell Affidavit). Captain Moody also spoke with Transfer Coordinator Cindy Haynes; the milk truck delivery driver; Classification Coordinator Dexter Gibbs; and Assistant Superintendent of Custody/Operations Margie Lawler. (Doc. No. 25-2 at 9-10). Transfer Coordinator Cindy Haynes stated that kitchen staff had never requested that Plaintiff be removed from the transfer backlog or for any inmate to be removed. (Id.). Haynes explained that Plaintiff was placed on the transfer backlog on September 28, 2010, to Avery/Mitchell Correctional Institution, and DOC's Population Management had removed Plaintiff from the transfer list. (Id.). Classification Coordinator Dexter Gibbs informed Captain Moody that, pursuant to Mountain View policy, Plaintiff was removed from the transfer list because he received an infraction for being in an unauthorized area on February 6, 2011. (Id. at 10). Captain Moody concluded that the Food Service staff was inconsistent in managing the kitchen area, but he did not find any evidence to substantiate Plaintiff's claims that Food Service staff had embezzled or misused state property. (Id.).

Special Investigator Reggie Weisner also investigated Plaintiff's allegations against Food Service staff at Mountain View and wrote a report documenting the results of his investigation. (Doc. No. 25-5 at 2, ¶ 5: Weisner Affidavit). Weisner noted that Plaintiff was one of four inmates who had made allegations against the Food Service staff. (Id. at 4: Exhibit A to Weisner Affidavit). Weisner reviewed Captain Moody's investigatory report and interviewed other inmates at Mountain View who worked in the kitchen. (Id. at 2, ¶ 5; ¶ 6). Weisner also interviewed members of the Food Service staff and requested that a Food Service audit be

12

performed.  (<u>Id.</u> at 2, ¶ 7).

Weisner concluded that inmates working in the kitchen were allowed to have access to beverages and leftover food.  (<u>Id.</u> at 4).  Although the practice was not covered by policy, Weisner noted that this was a common practice in prisons.  (<u>Id.</u> at 6).  Weisner also concluded that the Food Service staff was using V8 juice in diet salad dressing and using it as a substitute for other diet beverages.  (<u>Id.</u>).  This practice was inconsistent with DOC policy and has since been discontinued, but was not found to be fraudulent.  (Doc. No. 25-1 at 2, ¶ 5: Mitchell Affidavit).

Investigator Weisner also found no evidence to substantiate Plaintiff's allegations of retaliation, and he noted in his investigatory report that Plaintiff's misconduct in the kitchen began on January 19, 2011, and that Plaintiff did not begin expressing his concerns about Food Service staff until February 7, 2011.  (Doc. No. 25-5 at 6: Exhibit A to Weisner Affidavit).

## II.    STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides:

A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

FED. R. CIV. P. 56(a).  The rule goes on to provide procedures for responding to a motion for summary judgment:

c) Procedures.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions,

13

documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED. R. CIV. P. 56(c).

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues of fact for trial. Once the moving party has met that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Rather, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting FED. R. CIV. P. 56).

## III. DISCUSSION

   A.   Plaintiff's Claims Against Supervisors Defendants Mitchell, Freeman, and Ledford

Plaintiff alleges that Defendants Mitchell, Freeman, and Ledford are liable because they failed to act against or stop the alleged retaliatory and unconstitutional conduct of Defendants Hicks, Winebarger, Osteen, and Hodges.  See, e.g., (Doc. No. 21-1 at 3, ¶ 13: Ansel Declaration) ("Defendant Ledford failed to act against or stop Defendant Hicks and Winebarger's constitutional violations.").  Thus, Plaintiff's theory of liability against these three defendants is based on supervisory liability.[7]

To demonstrate supervisory liability under § 1983, Plaintiff would have to show that Mitchell, Freeman, or Ledford had actual or constructive knowledge that their subordinates, such as Defendant Hicks, were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Plaintiff, that their response was inadequate, and that there was a causal link between their inaction and Plaintiff's injury.  See Shaw v. Stroud, 13 F.3d 791, 799-800 (4th Cir. 1994).  Plaintiff has produced no evidence on summary judgment to show that the subordinates of Mitchell, Freeman, and Ledford were engaging in pervasive or widespread conduct that created a risk of constitutional to injuries to Plaintiff and other inmates.  Indeed, as the court discusses, infra, Plaintiff has not produced evidence on summary judgment that any of the Defendants violated Plaintiff's constitutional rights at all, much less that Defendants' conduct was "persuasive or widespread."  See Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984) (stating that a plaintiff "ordinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . .").  For these reasons, Plaintiff's claims against Defendants Mitchell, Freeman, and Ledford must be dismissed.

---

[7]  Since the doctrines of vicarious liability and respondeat superior do not apply in § 1983 actions, these Defendants' liability can only be based on supervisory liability.  See Vinnedge v. Gibbs, 550 F.2d 926, 927-99 (4th Cir. 1977); see also Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978).

B.     Plaintiff's Retaliation Claim

Next, Plaintiff alleges that Defendants Hicks and Winebarger charged him with bogus disciplinary infractions in retaliation for Plaintiff's exercise of his First Amendment right to free speech and to petition the government for a redress of grievances by questioning the staff's right to strip search inmates and by accusing kitchen staff of misusing food and embezzling state property.  The Fourth Circuit Court stated the governing principles regarding retaliation as follows:

> Retaliation by a public official for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the [retaliatory] act, when taken for different reasons, would have been proper.  A plaintiff alleging that government officials retaliated against her in violation of her constitutional rights must demonstrate, inter alia, that she suffered some adversity in response to her exercise of protected rights.  Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights.  Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation.  Thus, a showing of adversity is essential to any retaliation claim.

Am. Civil Liberties Union of Md., Inc. v. Wicomico Cnty., Md., 999 F.2d 780, 785 (4th Cir. 1993) (citations omitted).  "[C]laims of retaliatory actions are legally frivolous unless the complaint implicates some right that exists under the Constitution."  Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994).  Furthermore, because retaliation claims are so prone to abuse, a higher level of detail is required to support them.  Id. at 74.

Plaintiff's complaints regarding the staff's right to strip search inmates and his accusations that the kitchen staff was misusing food and embezzling state property were essentially grievances.  In support of their summary judgment motion, Defendants cite to a recent, unpublished Fourth Circuit decision, in which the Court held that an inmates's submission of an internal prison grievance was not constitutionally protected activity.  See Daye

v. Rubenstein, No. 10-6938, 2011 WL 917248, at *2 (4th Cir. Mar. 17, 2011), cert. denied, 132 S. Ct. 161 (2011).  In Daye v. Rubenstein, the plaintiff alleged that prison officials retaliated against him after he complained that black inmates were assigned to less desirable jobs than white inmates.  The court held that the plaintiff could not show a First Amendment retaliation claim because plaintiff's verbal complaints to prison officials were "essentially a grievance" and therefore "not constitutionally protected."  Id.  In another unpublished decision, the Fourth Circuit appeared to find that "[t]he First Amendment grants the rights to free speech and to seek redress of grievances.  These rights, to a limited extent, exist in a prison setting."  Gullet v. Wilt, No. 88-6797, 1989 WL 14614, at *2 (4th Cir. Feb. 21,1989). [8]  This court will assume for purposes of this case that Plaintiff's complaints about the staff's right to strip search inmates and his accusations that the kitchen staff was misusing food and embezzling state property implicated Plaintiff's First Amendment rights of free speech and the right to petition the government for a redress of grievances.  Accord Johnson-El v. Beck, No. 3:11-cv-115, 2011 WL

---

[8]Seven circuits appear to have held that prison grievances implicate a prisoner's First Amendment rights of free speech and to seek redress of grievances.  See Hill v. Lappin, 630 F.3d 468, 472 (6th Cir. 2010) (recognizing a prisoner's "undisputed First Amendment right to file grievances against prison officials on his own behalf"); Gee v. Pacheco, 627 F.3d 1178, 1189 (10th Cir. 2010) (recognizing the filing of grievance as a protected First Amendment right); Haynes v. Stephenson, 588 F.3d 1152, 1155-56 (8th Cir. 2009) ("The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity."); Bibbs v. Early, 541 F.3d 267, 272 (5th Cir. 2008) (holding that plaintiff stated a cognizable claim where prison officials allegedly subjected him to sub-freezing temperatures for four consecutive nights in retaliation for filing grievances); Boxer X v. Harris, 437 F.3d 1107, 1112 (11th Cir. 2006) ("First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment."); Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005) (holding that plaintiff stated a claim where he alleged prison officials destroyed property, threatened transfer, and assaulted him in retaliation for filing grievance and lawsuit); Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004) (holding that plaintiff stated a claim where prison officials allegedly issued false misbehavior reports and sentenced him to three weeks in "keeplock" in retaliation for using grievance system).

1155679 (W.D.N.C. Mar. 25, 2011) (citing Gullet).

To state a First Amendment § 1983 retaliation claim, a plaintiff must establish three elements: (1) the plaintiff's right to speak was protected; (2) the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech; and (3) a causal relationship existed between the plaintiff's speech and the defendant's retaliatory action. Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685-86 (4th Cir. 2000) (citations omitted). As to the first element, the Court has already determined that Plaintiff's complaints implicated his First Amendment rights to free speech and to petition the government for a redress of grievances.

Turning to the second element, "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of [the protected] rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (internal quotation marks and citations omitted). Assuming that the disciplinary infractions constitute adverse action that would likely deter a person of ordinary firmness from the future exercise of his First Amendment rights, Plaintiff has failed to show a causal connection between his complaints and the disciplinary infractions on January 19, February 3, and February 6. Merely alleging retaliation is not sufficient to state a claim for relief. Rather, Plaintiff must come forward with specific evidence "that but for the retaliatory motive, the complained of incident . . . would not have occurred." Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995). Complaints that offer nothing more than conclusory allegations of retaliation may be summarily dismissed. Adams, 40 F.3d at 74.

Here, the only evidence of retaliation that Plaintiff has presented on summary judgment is that he complained about the staff's right to strip search inmates and he accused the kitchen staff of misusing food and embezzling state property, and that he was subsequently charged with

three disciplinary infractions.  Plaintiff alleges in conclusory fashion, without presenting any sworn affidavits in support of his claim, that other inmates committed the same disciplinary infractions as Plaintiff, but that Plaintiff was singled out for punishment because of his complaints.  Plaintiff also contends, alternatively, that the disciplinary infraction charges brought against him were simply false and that Defendants Hicks and Winebarger simply fabricated the charges as a means to punish Plaintiff.

Plaintiff's conclusory allegations, without more, are insufficient to overcome Defendants' summary judgment motion, particularly where Defendants have presented sworn affidavits and other evidence showing that Plaintiff committed the infractions at issue and that the charges were not fabricated.  As for his claim that he was singled out for infractions when other inmates were involved in the same conduct, Plaintiff again has failed to provide admissible evidence on summary judgment to support this claim.  Rather, Plaintiff has presented conclusory arguments, and he relies on hearsay and inmate gossip, none of which were substantiated in the two investigations that were conducted.  For instance, Captain Moody interviewed an inmate that Plaintiff said would substantiate his allegations, but the inmate failed to do so.  See (Doc. No. 25-2 at 6-7: Exhibit A to Mitchell Affidavit).  Furthermore, other inmates who complained about kitchen staff either refused to give written statements or to give the names of the inmates from whom they received their information.  (Id.).  Finally, as Defendants note, prison officials began investigating Plaintiff's misconduct (on January 19, 2011) before Plaintiff voiced his concerns about Food Service staff (on February 7, 2011).  (Doc. No. 25-5 at 2, ¶ 9: Weisner Affidavit).

Finally, Plaintiff has also failed to demonstrate that the conduct of prison officials adversely affected his constitutional rights.  Plaintiff was able to file written grievances and a subsequent lawsuit; therefore, his access to the courts was not hindered.  Accord Reeves v.

Hubbard, No. 1:08cv721, 2011 WL 4499099, at *8 (M.D.N.C. Sept. 27, 2011) ("Any interference in Plaintiff's participation in the NCDOC's grievance process thus falls short of the requisite adversity needed to make out a federal constitutional retaliation claim, particularly where, as here, Plaintiff has not shown that any such interference negatively impacted his ability to litigate."). Furthermore, the January 19 and February 6 infractions were ultimately dismissed. As to the February 6 infraction for coming to work when he was not assigned to work that day, Plaintiff pled guilty to that charge. Therefore, Plaintiff cannot now claim that the charge was fabricated and merely brought in retaliation for his prior complaints. Based on the foregoing, Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

      C.      Plaintiff's Due Process Claim

Next, Plaintiff alleges that his due process rights were violated in his hearings for the disciplinary infractions. In order to show the deprivation of a liberty interest protected by the Due Process Clause, an inmate must show either that: (1) the conditions exceed the sentence imposed in such an unexpected manner as to give rise to protection by the Due Process Clause or (2) the confinement creates an atypical or significant hardship in relation to the ordinary incidents of prison life. See Sandin v. Conner, 515 U.S. 472, 483-84 (1995); McNeill v. Currie, 84 F. App'x. 276, 277 (4th Cir. 2003).

In Wolff v. McDonnell, 418 U.S. 539 (1974), the Supreme Court set forth the rights that must be afforded to an inmate in the context of a prison disciplinary hearing that results in the loss of good time credits. Under Wolff, the inmate must receive: (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the fact-finder of the evidence relied on and the reasons for the disciplinary

action.  Id. at 563-66; see also Superintendent Mass. Corr. Inst. at Walpole v. Hill, 472 U.S. 445, 454 (1985) (discussing Wolff).

Here, even assuming that Plaintiff's allegations are true, there is no genuine issue of material fact as to whether Plaintiff's due process rights were violated.  Defendants' summary judgment materials show that the DOC's Inmate Disciplinary Procedures provided the procedural due process rights required by Wolff and that prison officials followed that procedure.

First, before the hearing on February 9, 2011, Plaintiff received and signed a Notice of Hearing on February 7, 2011, indicating that he read and understood his rights.  (Doc. No. 25-3 at 21: Exhibit A to Osteen Affidavit).  On February 9, 2011, Plaintiff also signed an Offense Report indicating that he understood the charges against him and that he received proper notice of the hearing.  (Id. at 8).  Defendants' evidence also shows that, after taking Plaintiff's statement concerning the February 3, 2011, charge, Defendant Hodges reinterviewed Defendant Hicks and examined the food cooler and found that items were in the cooler as described by Defendant Hicks.  Defendant Hodges did not call the witnesses that Plaintiff requested because he determined that these witnesses could provide no evidence relevant to the disciplinary infractions for which Plaintiff was charged.  See (id. at 33; 36; 38).

Defendants' summary judgment materials also show that, although Plaintiff was offered staff assistance at the February 9, 2011, hearing, he refused to speak with the assisting officer.  It was not until after Plaintiff was found guilty of committing the January 19 and February 3 infractions that he raised the fact that he had not waived his right to 24-hour notice of the hearing.  Once Plaintiff raised the notice issue, Defendant Osteen re-examined the paperwork and verified that Plaintiff was correct.  (Id. at 2, ¶ 5: Osteen Affidavit).  With Defendant

Osteen's assistance and urging, Plaintiff appealed the January 19 and February 3 infraction convictions and both infractions were ultimately dismissed. (Id.). Plaintiff's credit time was reinstated; the prison returned to Plaintiff the money that had been taken from his trust account; and Plaintiff was not required to perform any community service hours. (Id. at ¶¶ 6, 7). Despite the fact that an error was made as to Plaintiff's waiver of his rights to 24-hour notice, the error was corrected on appeal and Plaintiff did not lose gain time or suffer any monetary loss. Furthermore, the subsequent loss of his kitchen position was due to his guilty plea for the February 6 charge, not the January 19 or February 3 charges.

Plaintiff was also afforded his procedural due process rights at the February 15 hearing. Plaintiff received and signed a Notice of Hearing on February 7, 2011, and he subsequently signed a Waiver of Hearing and pled guilty to the February 6 infraction. (Id. at 21, Ex. A to Osteen Affidavit). Before the hearing, Defendant Osteen questioned his supervisor to ensure that a conflict of interest did not exist before presiding over the hearing, and he was informed that it was appropriate for him to reside over the hearing. (Id.).

Plaintiff now alleges that he was under duress when he signed the waiver and pled guilty, but Plaintiff has presented no sworn affidavits or other admissible evidence in response to Defendants' summary judgment. Rather, he relies on the allegations in his Complaint. Therefore, he has not presented any admissible evidence showing that he was under duress when he pled guilty to the February 6 infraction. In sum, Plaintiff cannot simply rely on his unsworn pleadings in opposing Defendants' summary judgment motion, and he has failed to come forward with evidence from which reasonable jurors could find that there is a genuine issue of material fact as to whether Plaintiff's procedural due process rights were violated.

Throughout his Complaint, Plaintiff alleges that he was denied due process because he

not allowed to present all of the evidence that he wanted to present at the disciplinary infraction hearings. This argument is without merit. Under Wolff, an inmate must be allowed an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense. Wolff, 418 U.S. at 566. The Wolff Court also held, however, that inmates do not have an unqualified right to present evidence and call witnesses because of the "obvious potential for disruption and for interference with the swift punishment that in individual cases may be essential to carrying out the correctional program of the institution." Wolff, 418 U.S. at 566. Under Wolff, a prisoner is not entitled to introduce irrelevant matters at a disciplinary hearing. Id. Furthermore, prison officials must be given the "necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." Id.

Here, Plaintiff was allowed to present some of the evidence that he wanted to present at the hearings, and the hearing officers had considerable discretion in determining what witnesses would be allowed to testify. As the Court previously noted, at the February 6 hearing on the January 19 and February 3 infractions, Defendant Hodges refused to allow certain witnesses to testify because he determined that their testimony would not have been relevant to the infraction against Plaintiff. In any event, the fact that Plaintiff was not allowed to present certain evidence at the February 6 hearing did not prejudice him since the January 19 and February 3 infractions were ultimately dismissed. As for the February 15 hearing, since Plaintiff pled guilty to the February 6 infraction, he has waived any argument that he was not allowed to present certain evidence at that hearing. Furthermore, as the Court has already discussed, Plaintiff has not presented evidence showing that he was under duress when he pled guilty to the February 6

infraction.  In sum, Plaintiff has not shown a due process violation based on his contention that he was not allowed to present certain evidence at the disciplinary infraction hearings.

The Court also observes that Plaintiff attached sworn declarations of other inmates in support of his Motion to Strike.  See (Doc. No. 30).  By Order dated March 2, 2012, this Court denied the Motion to Strike.  (Doc. No. 31).  In the sworn declarations, several inmates assert that, contrary to the statements in the investigation reports, they have never received chocolate milk as a substitute for white milk; or that they have never substituted V8 juice for soy milk. (Doc. No. 30-4 at 1: Olson Declaration; Doc. No. 30-5 at 1: Chambers Declaration; Doc. No. 30-6: Waldrop Declaration).  Furthermore, inmate Charles Black asserts that he did not, contrary to statements in the investigation reports, make allegations concerning Food Service staff embezzling food items and other misconduct, nor did he say that Plaintiff was "trouble."   (Doc. No. 30-7 at 1: Black Declaration).

These Declarations were submitted in support of Plaintiff's motion to strike, not in support of his response to Defendants' summary judgment motion.  The Court notes that, even if the Court were to consider this evidence as part of Plaintiff's summary judgment materials, the declarations submitted by these inmates are not enough to overcome Defendants' motion for summary judgment because the issues of disputed fact raised in the Declarations are simply not issues of material fact, as required under Rule 56.  See Thompson Everett, Inc. v. Nat'l Cable Advertising, L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) ("[T]he mere existence of some disputed facts does not require that a case go to trial.  The disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict.") (emphasis added).

In sum, for the reasons stated herein, the Court will grant Defendants' motion for summary judgment as to Plaintiff's retaliation and due process claims.[9]

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1.     Defendants' Motion for Summary Judgment, (Doc. No. 24), is **GRANTED**, and Plaintiff's Motion for Partial Summary Judgment, (Doc. No. 22), is **DENIED**;

2.     Plaintiff's Notice of Objection and Motion to Reverse Decision re Order on Motion to Strike and Motion to Compel, (Doc. No. 32), is **DENIED** as **MOOT**.

3.     The Complaint is **DISMISSED with prejudice**.  The Clerk is respectfully directed to close the case.

Signed: September 28, 2012

Robert J. Conrad, Jr.
Chief United States District Judge

---

[9] Defendants also contend that they are entitled to qualified immunity.  Because the Court has found that Defendants did not violate Plaintiff's constitutional rights in the first instance, the Court does not need to address the issue of qualified immunity.